WILSON, J.,
dissenting:
¶ 20. I am persuaded that the unusual provision in the lease between Rose Greer and the Nunnerys is enforceable under Ford v. Hegwood, 485 So.2d 1044 (Miss. 1986). Therefore, I respectfully dissent.
¶ 21. As the majority explains, Ford did not involve a lease. It involved a “Warranty Deed” by which a husband and wife attempted to “sell, convey, and warrant” land to their son “at OUR DEATH,” i.e., at the death of the husband and wife. Id. at 1045. Ford addressed the question whether such an instrument, though in the form of a deed, must be treated as testamentary. The opinion describes “two complementary lines of cases” on the subject. Id. One line of cases, exemplified by Tapley v. McManus, 175 Miss. 849, 854-55, 168 So. 51, 52 (1936), holds that when an instrument “makes no present conveyance of an interest in land or otherwise directs that the interest to be conveyed vests in the grantee only upon the death of the grantor, [it] is regarded as testamentary in character and is enforceable only if made in compliance with our statute of wills.” Ford, 485 So.2d at 1045. The other line of cases stands for the proposition that if a deed “conveys a future interest in land which vests in the grantee effective upon delivery ..., though reserving in the grantor a life estate, the effect of which is to postpone only the grantee’s right of possession or occupancy,” it will be treated as a deed and enforced even if it does not comply with the statute of wills. Id. (citations omitted) (citing Buchanan v. Buchanan, 236 Miss. 751, 756-57, 112 So.2d 224, 226-27 (1959)). The Court thought that “rules of law emanating from these cases [were] clear,.[so] no useful purpose would be served by a detailed consideration of same.” Id. at 1046. Instead, the Court simply reported that it had “reviewed the language of the instrument under construction in each such case” (a total of fourteen were cited) and that the instrument in Ford fell somewhere between the two lines. Id. Thus, the Court’s decision would “of necessity expand the rule of one line an inch or two toward the other.” Id. Ford has not been cited on this issue in the thirty years since, so presumably the two lines remain wherever Ford left them.
¶ 22. The Court explained that a decision regarding which line of cases to expand had to be made
... against the backdrop of one of the grand purposes of our law: to enable persons to achieve legitimate ends which *1201 without law would be impossible of achievement. Our law facilitates the realization of dreams, modest or grand, private or charitable. In this regard law vests certain powers in each of us. We are given to believe that, without further authorization, we may with effect exercise those powers, so long as we conform to certain general enabling rules.
When doubtful cases arise it is incumbent upon us that we build our adjudication upon the cornerstone of this grand purpose of our law. Where as here individuals seek to accomplish ends authorized by our law, we are obliged to take upon ourselves a positive attitude that the law may serve, not thwart, the legitimate aspirations of those individuals. Put otherwise, the rules of strict construction sometimes applied when enforcement of penal rules is at issue give way in the present context to an appropriate degree of liberality.
One end our ancestors thought a necessary incident of freedom, and for which they long fought, was the right to own property and necessarily the right to dispose of one’s property as one sees fit. Our law today empowers persons to accomplish these ends—to be sure, with notable restrictions, none of which affect today’s adjudication.
Id. Thus, if possible, we should uphold an instrument by which an individual attempted to dispose of her property as she sees fit. To that end, we must construe such an instrument with “an appropriate degree of liberality” in a way that renders it valid rather than invalid, and we must resolve “doubtful cases” in favor of finding the instrument valid.
¶23. Applying these principles, the Court upheld and enforced the warranty deed at issue in that case. The Court reasoned,
The words of the instrument communicate to the reader a dominant intention on the part of the Hegwoods that at their death their property belong to their son and his heirs. This dominant intention being one accomplishment of which our law allows through the facility of a deed of conveyance, we have no reasonable alternative but to enforce it.
Id. at 1047. The first sentence simply stated the obvious. The Hegwoods’ intent was clear. The question was whether the instrument expressing their intent was invalid because it did not comply with the statute of wills, as is generally required when a person wants to convey property to another at his or her death. On that issue, the Court seemed to say that because “our law allows” such a transaction to be accomplished through a deed with a reservation of a life estate, the Court was compelled to construe the deed in that way and enforce it. See id. Thus, the Court interpreted the deed as conveying “fee simple title” upon execution “subject only to a life estate.” Id. The Court did so even though the plain language of the deed, which was recorded only after Mr. Hegwood died eleven years later, stated that the conveyance would occur only at the Hegwoods’ death. See id. at 1045, 1047.
¶24. The Court summarized the overarching rule on this issue as follows:
[W]e regard it as a sound rule of construction to resolve doubts in favor of treating the instrument as a deed rather than a will. Put otherwise, an instrument such as that under consideration here appearing in the form of a deed should be adjudicated testamentary in character and subject to the statute of wills only where such affirmatively and clearly appears from the language of the instrument.
Id. at 1047 (emphasis added). Buchanan, supra, had similarly stated:
*1202 [W]hen an instrument-purports to be a deed and is in the words5 and form of a deed and is acknowledged as such, it should be construed to be testamentary in character and inoperative as a deed of conveyance when, and only when, it affirmatively. and clearly appears from the language of the instrument itself, giving due consideration to all its-provisions, tha/b it was the intention of the person signing it that the instrument itself would have no effect until his death.
Buchman, 236 Miss. at 756, 112 So.2d at 227 (emphasis added).
¶25. This case involves a lease, not a deed. ■ And while Ford is the closest precedent, the’fact that the case involves a lease is relevant to our analysis. To begin with, it is- undisputed that “the instrument itself’—the lease—-was intended to and did take effect when it was executed. Thus, if the relevant “instrument” is the lease, this po’int alone seems to be a sufficient reason not to regard the challenged provision as testamentary.
¶26. But even if our analysis, must focus on the specific language that Oaks challenges, it should be enforced as written. It is important to keep in mind that the language at issue is only part of one section of a' twenty-five year lease agreement between the Nunnerys and Greer. The Nunnerys agreed to this language and, for all we know, may have requested it or even insisted on it. Particularly given the length of the lease and the Nunner-ys’ use1 of the property to operate their dairy business, the Nunnerys may have assigned some value to a contractual right to deal with -a specifically identified person—rather than some unknown heir or heirs—in the event of Greer’s death.[1] Indeed, this lawsuit seems to illustrate the potential value of the provision to the Nun-nerys. Oaks sued both Ball and the Nun-nerys and sought a declaration that the entire lease had terminated. Specifically, Oaks asked the Court to declare that Section 3 was invalid in its entirety and, therefore, that the lease terminated on Greer’s death. The Nunnerys filed a counterclaim, and the Nunnerys and Oaks eventually agreed to dismiss their claims against one another based on a stipulation, signed by counsel on behalf of all parties, “that the lease at issue in this litigation is valid, binding, and enforceable.”[2]
¶ 27. Regardless of why this language was inserted in the lease agreement, the larger point is that it was part of a valid agreement between Greer and the Nun-nerys. Therefore, Greer could not have revoked the language unilaterally or without the Nunnerys’ consent. For this reason, I am unable to say that it “affirmatively and clearly appears from the language of the instrument itself, giving due consideration to all its provisions, that it was the intention of the person[s] signing it that the instrument itself would have no effect until [Greer’s] death.” Buchanan, 236 Miss. at 756, 112 So.2d at 227 (emphasis added). The Nunnerys had an immediate right to insist that this agreed-upon provision remain a part of their lease agreement without change.
¶ 28. Í read Ford to say that we should refuse to enforce a voluntary assignment of property rights only if it “affirmatively arid clearly appears from the language of the instrument” that it was intended only *1203 as a testamentary gift and served no other purpose. Ford, 485 So.2d at 1047. This does not describe the assignment in this case, which directly affects other parties (the Nunnerys) and requires Ball to pay property taxes in addition to receiving rental payments. Based on Ford’s instruction that even “doubtful cases” should be resolved in favor of finding the instrument valid, I conclude that the challenged language is simply one part of a valid lease, not an invalid testamentary gift hidden in a lease.
¶ 29. Although certain language in Ford and Buchanan can be read to support the majority opinion, I am persuaded that the lease provision at issue in this case is enforceable under the principles articulated and applied in those decisions. Accordingly, I respectfully dissent.
LEE, C.J., IRVING, P.J., AND FAIR, J., JOIN THIS OPINION.

: Under the lease, the lessor is obligated to pay taxes on the property. The lease also provides that the Nunnerys must seek the - lessor’s preapproval of “any significant variation from the [property’s] intended use” as a dairy business,

. Ball has' not argued on appeal that Oaks stipulated to the validity of the assignment.